IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-01547-MEH

PENNIE LANDON,

      Plaintiffs,

v.

WINSTON HOSPITALITY, INC.,
WINSTON HOLDINGS, INC., and
DELTA FIVE SYSTEMS, LLC,

      Defendants.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court is Defendants' "Motion for Summary Judgment" ("Motion"). ECF 63. The Motion is fully briefed, and the Court finds that oral argument would not materially assist in adjudicating the Motion. For the following reasons, the Motion is granted.

## BACKGROUND

      Plaintiff was a regional director of sales for Defendant Delta Five Systems, LLC ("Delta Five" or "Company"). ECF 79 at 2. As asserted by Plaintiff and unchallenged by Defendants in their Motion, Defendant Winston Hospitality, Inc., Defendant Winston Holdings, Inc., and Delta Five are an integrated, single employer. *Id.* Plaintiff was the salesperson responsible for selling Delta Five's bed-bug remediation devices. ECF 63 at 2, ¶ 1. During her employment, an interim CEO of Delta Five, Stephen Wiehe, made lewd comments about and to Plaintiff. *Id.* at 5–6. Near the end of her employment relationship, Delta Five also hired two male salespeople. *Id.* at 8–9. Because Plaintiff vocalized that she found Mr. Wiehe's comments uncomfortable, she asserts that

the hiring of the two male salespeople was in an effort to replace her. ECF 75 at 37. After being

with the Company for almost a year and having several months without any sales, Plaintiff was

eventually terminated by the new CEO, Robert Winston. ECF 63 at 18.

Plaintiff filed suit on May 29, 2020. ECF 1, Compl. On October 6, 2020, she filed the

operative Amended Complaint. ECF 33. In that pleading, Plaintiff brings eight claims against

Defendants: (1) gender discrimination in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e *et seq*.; (2) retaliation in violation of Title VII; (3) discrimination

in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*;

(4) failure to accommodate in violation of the ADA; (5) retaliation in violation of the ADA; (6)

unpaid commissions pursuant to the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-101 *et seq*.;

(7) breach of contract; and (8) unjust enrichment. Defendants have moved for summary judgment

on all claims.

## STANDARDS OF REVIEW

A motion for summary judgment serves the purpose of testing whether a trial is required.

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary

judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show

there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter

of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the

governing substantive law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis

for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has

the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—

his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact

could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id*. at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)). Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings  and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)). "The court views the record and draws

all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

<u>**STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

To begin, the Court notes that Plaintiff provided an additional 102 material disputed facts in her Response brief. The Court has incorporated those when appropriate. However, many of the facts supplied by Plaintiff concern pretext. As the Court explains later, Plaintiff has failed to meet her prima facie burden, so many of the facts are immaterial to the Court's analysis. The same is true for many of the facts supplied by Defendants, especially those facts relating to claims Plaintiff has abandoned; however, the Court incorporates those facts for purposes of keeping the numbered paragraphs in the Motion and this Order consistent. Finally, Plaintiff has provided numerous facts that are, at least on their face, inadmissible without explanation of how each fact can be considered on summary judgment. With all that in mind, the following are the Court's findings of material facts that are relevant to the Court's analysis and either undisputed or supported by the record, when viewed in the light most favorable to Plaintiff as the non-moving party.

1.      On December 5, 2017, Delta Five sent Plaintiff a conditional[1] offer letter for at-will employment as a salesperson responsible for selling Delta Five's bed-bug remediation devices. ECF 63-1, Ex. A (P. Landon Dep.) at 53:13–23; *id.* (Dep. Ex. 36) at 125–26; ECF 63-2, Ex. B (R. Winston Dep.) at 55:6–25, 69:16–19.

---

[1] Plaintiff disputes that the offer letter was contingent or conditional. However, she cites to the first paragraph of her declaration which states, "I am the Plaintiff in this action, and I have personal knowledge of the matters set forth below." ECF 68-1, Ex. 1 (P. Landon Decl.) at 1, ¶ 1. Such a citation does not create a genuine dispute of material fact. Regardless, the offer letter states that the "offer of employment is *conditional* upon" Plaintiff meeting certain criteria (e.g., passing a background check). Ex. A at 125–26 (emphasis added).

2.      The offer letter contained, among other information, the terms governing Plaintiff's compensation. Ex. A at 125–26.

3.      Plaintiff's salary was $105,000 annually, and she was entitled to earn commissions of between 1.8% and 2.9% on the sale price of all Delta Five device "sales procured directly by [her]." *Id.*

4.      Plaintiff testified that this meant she would be entitled to a commission when the product was shipped and if the customer paid for the product. *Id.* at 101:11–102:3.

5.      Plaintiff would not be entitled to commissions on future sales made by subsequent salespeople. *Id.* at 60:18–61:10.

6.      Neither Plaintiff's salary nor the terms of her commission plan changed during her employment. *Id.* at 58:8–12, 106:13–18.

7.      Plaintiff was responsible for selling Delta Five's proprietary pest management device to national hotel chains and hospitality clients. *Id.* at 55:17–22, 73:3–7, 86:7–18.

8.      Plaintiff was one of several Delta Five sales employees. *Id.* at 61:22–62:14.

9.      Delta Five fostered a work environment[2] in which its salespeople worked together to achieve common objectives. *Id.* at 57:16–58:7.

10.     Plaintiff made, or received credit for, fifteen sales during the entire course of her employment from mid-January 2018 to mid-January 2019. ECF 63-3, Ex. C (P. Bell Decl.), Decl. Ex. A at 5–6 (Delta Five sales and commissions spreadsheet).

11.     Thirteen of these fifteen sales occurred within the first eight months of Plaintiff's employment. *Id.*

---

[2] Defendants' proffered fact states that Delta Five fostered a "collaborative" work environment. To the extent this is even material, the Court finds that characterization to be disputed. *E.g.*, ECF 68-3, Ex. 3 (R. DiPasquale Decl.) at 2–3, ¶¶ 10–11.

12.     Plaintiff closed no sales between August 8, 2018 and January 16, 2019. *Id.* She received commission payments for two sales that closed shortly after the end of her employment.[3] *Id.*

13.     Although at the time of her deposition Plaintiff believed she was owed a sales commission related to a hotel company named Kalahari, Ex. A at 100:13–19, Plaintiff now "concedes that she no longer claims commissions from Kalahari resorts." ECF 75 at 3, ¶ 13.

14.     The devices were never delivered to Kalahari, and Kalahari never paid. Ex. A at 100:20–25; Ex. C, Decl. Ex. A.

15.     Plaintiff tried to secure "approved standard" and/or "approved vendor" contracts with Hilton and Wyndham hotels, and, at the time of her deposition, believed she was entitled to compensation for this effort. Ex. A at 95:9–96:13, 97:21–99:2, 100:17–19. Now, Plaintiff "concedes she no longer claims such compensation." ECF 75 at 3, ¶ 15.

16.     These contracts would not have directly resulted in the sale of any devices to Hilton or Wyndham entities; rather, they would have secured for Delta Five the right to try to later sell devices to individual Hilton or Wyndham branded hotels. Ex. A at 95:9–96:13, 97:21–99:2.

17.     Becoming an approved standard/vendor for Hilton and Wyndham was a business goal for Plaintiff and a very important strategic goal for Delta Five. *Id.* at 103:6–15, Dep. Ex. 39 at 129; Ex. B at 59:7–23.

18.     Plaintiff had a business development goals spreadsheet reflecting this and showing "payout" amounts for achieving each goal (e.g., "12k" for Hilton and "8k" for Wyndham). Ex. A, Dep. Ex. 39 at 129.

---

[3] The fact that Plaintiff may have been working on these sales in December 2018 does not create a genuine dispute that they closed after her employment. Ex. 1 at 4, ¶ 14.

19.     She testified that she came up with and created the dollar amount in the payout column and that she and Dr. Jason Janet, Delta Five's then-CEO, believed that it was a fair amount of compensation. Ex. A at 103:15–105:1. Plaintiff came up with the dollar amounts by "just stat[ing]" the amounts she believed to be fair. *Id.* at 104:23–105:1.

20.     The "payout" for Plaintiff's business development goals was not tied to selling devices and was not to be considered a commission. *Id.* at 105:6–22.

21.     Plaintiff further testified that there was no promise[4] of payout and that Dr. Janet never altered Plaintiff's base compensation or the terms of her commission agreement in light of, or to reflect, the alleged entitlement to "payout" for meeting business development goals. *Id.* at 103:3–5, 106:5–18.

22.     Plaintiff never achieved her goal, and Delta Five never became an approved vendor for Hilton. *Id.* at 110:7–112:9; Ex. B at 63:12–25.

23.     Likewise, Plaintiff never achieved her goal of making Delta Five an approved vendor for Wyndham. Ex. A at 112:10–113:7; Ex. B at 73:9–14.

**The HITEC Conference**

24.     In June 2018, Plaintiff attended a technology conference ("HITEC") in Houston as part of her employment with Delta Five. Ex. A at 113:8–24.

25.     Plaintiff was joined by other Delta Five employees including Dr. Janet, Ms. Natalie Fussell,[5] and Ms. Robyn DiPasquale. *Id.* at 114:4–7.

---

[4] Plaintiff specifically testified, "A promise? I – a promise? I would say – he didn't phrase it as a promise, but yes, this was an – this was a commitment that we made." Ex. A at 106:10–12.

[5] There is an apparent (albeit, non-material) dispute regarding the spelling of Ms. Fussell's name. Defendants refer to her as Natalie "Gissell." Plaintiff posits that the surname was transcribed incorrectly, so the name should be "Fussell." The only other instance in which the "Fussell" spelling appears in the briefing is in paragraph 168 of page 22 of Plaintiff's Response. There, Plaintiff cites to Ms. Bell's deposition, but that document only refers to the individual as "Natalie."

26.     Mr. Stephen Wiehe, then an advisory board member of Delta Five, was also present. *Id.* at 114:8–9; Ex. B at 32:7–12.

27.     While manning the Company's booth with Plaintiff, Mr. Wiehe commented two or three times about the size of the buttons on her jacket. Ex. A at 115:20–116:8; ECF 63-4, Ex. D (S. Wiehe Dep.) at 79:5–21, 84:8–12. Dr. Janet recalls hearing Mr. Wiehe emphasize the first syllable of "large buttons" each time. ECF 68-2, Ex. 2 (J. Janet Decl.) at 2, ¶ 5.

28.     Plaintiff admits that she was, in fact, wearing a jacket with large buttons on it, with each approximately two inches in diameter. Ex. A at 116:9–117:4.

29.     Neither Plaintiff nor anyone else present responded to Mr. Wiehe's comments. *Id.* at 117:20–119:8.

30.     Mr. Wiehe never made any other allegedly offensive or unprofessional remarks to Plaintiff while the two were manning Delta Five's booth. *Id.* at 119:9–12.

31.     Later that evening, the Delta Five team (Plaintiff, Mr. Wiehe, Dr. Janet, Ms. Fussell, and Ms. DiPasquale) attended a dinner together. *Id.* at 119:13–21.

32.     Mr. Wiehe, once again, made at least one comment about the size of the buttons on Plaintiff's jacket. *Id.* at 121:5–11.

33.     Again, no one present reacted to this comment when it was said. *Id.* at 121:12–23.

34.     Mr. Wiehe also told a story from his previous employment—he said that a boss of his once made a comment upon seeing a woman walk by (without knowing that the woman was Mr. Wiehe's wife) that he (the boss) would like to sleep (using a more vulgar word) with that woman. *Id.* at 122:10–22; Ex. D at 63:13–64:1.

---

ECF 68–7 (P. Bell Dep.) at 39:21–40:3, 114:6–115:15. On the other hand, Dr. Janet's Declaration refers to her as "Natalie Fussell."  ECF 68-2 (J. Janet Decl.) at 3, ¶ 5. Based on this declaration, the Court will use the "Fussell" spelling.

35.     Plaintiff later asserted that she found the story "offensive," but neither she nor anyone else responded with any sort of complaint or objection to the story at the time Mr. Wiehe told it. Ex. A at 122:23–124:11.

36.     To Plaintiff's knowledge, Mr. Wiehe made no other allegedly inappropriate comments that evening. *Id.* at 124:23–25.

37.     Shortly after Plaintiff left the dinner, she received a phone call from Dr. Janet who wanted to apologize for Mr. Wiehe's story. *Id.* at 127:4–20.

38.     No other discussion of Mr. Wiehe's behavior occurred that night, *id.* at 128:2–5, and Plaintiff does not recall saying anything to Dr. Janet regarding Mr. Wiehe's comments about her buttons, his dinnertime story, or any effect Mr. Wiehe's comments allegedly had on her, *id.* at 128:17–129:8.

39.     After the conference, Plaintiff flew home to Colorado and resumed her normal work schedule. *Id.* at 129:9–18.

40.     On Plaintiff's first day back at work, Ms. Melanie Ferlito, then Delta Five's Vice President of Marketing, called Plaintiff to get her side of the story because Ms. Ferlito had already spoken to Dr. Janet and Ms. Fussell. *Id.* at 129:19–130:2.

41.     Plaintiff confirmed to Ms. Ferlito that the version of events Dr. Janet and Ms. Fussell had reported was accurate. *Id.* at 131:10–12.

42.     Plaintiff also told Ms. Ferlito that Mr. Wiehe's comments were "offensive and unwarranted." *Id.* at 132:1–4.

43.     Plaintiff does not recall whether she characterized her comments to Ms. Ferlito as a "complaint" but believed the incident had been lodged with Human Resources. *Id.* at 132:14–133:11.

44.     Indeed, during her deposition, Plaintiff testified that her invocation of the word "complaint" may have been "misused." *Id.* at 132:19–22.

45.     Moreover, Plaintiff never affirmatively complained to anyone or reported "the incident"; she left it to others to handle. *Id.* at 132:23–133:11.

46.     Plaintiff does not recall ever speaking with anyone else about the HITEC events. *Id.* at 133:19–134:21.

47.     Specifically, Plaintiff did not contemporaneously speak to Ms. Patti Bell, Vice President of Human Resources. *Id.* at 133:25–134:2.

48.     Aside from her initial interaction with Dr. Janet, Plaintiff does not recall ever speaking to him or complaining to him about what happened. *Id.* at 134:4–19.

**Interactions with Mr. Wiehe following HITEC**

49.     On or around July 20, 2018, Robert "Bob" Winston, owner of Defendants, asked Mr. Wiehe to serve as Delta Five's interim CEO after Dr. Janet had left the Company. Ex. A at 80:17–18; Ex. D at 35:4–35:12; Ex. B at 44:4, Dep. Ex. 4 at 23.

50.     Despite Mr. Wiehe becoming interim CEO—a role that technically made him Plaintiff's supervisor—Plaintiff described her relationship with Mr. Wiehe as "limited." Ex. A at 80:19–81:9.

51.     She described it this way due to Mr. Wiehe being in the office only a couple days a week and her working remotely. *Id.*

52.     Mr. Wiehe ran the Delta Five sales team's group sales calls, but in the last six months or so of her employment, Plaintiff saw Mr. Wiehe fewer than ten times. *Id.* at 81:10–21.

53.     Personally, Plaintiff stated that she thought Mr. Wiehe could be "rude" and "arrogant." *Id.* at 82:17–18.

54.     Even if Plaintiff disliked Mr. Wiehe, she never had any post-HITEC interactions with him that were inappropriate, offensive, or discriminatory. *Id.* at 135:16–25.

55.     In fact, not only did Mr. Wiehe never make additional offensive remarks to Plaintiff, but he also never made (so far as Plaintiff is aware) offensive remarks to anyone. *Id.*

56.     Mr. Wiehe only served as interim CEO for approximately 50 days. Ex. D at 39:19–25.

57.     Plaintiff never complained to Mr. Winston about him making Mr. Wiehe the interim CEO. Ex. A at 193:1–18.

**Personnel and Business Changes at Delta Five**

58.     After Mr. Wiehe, Mr. Winston took over the CEO role and Delta Five hired Mr. Stephen La Barbera as Chief Revenue Officer.[6] ECF 68-4, Ex 4 (S. La Barbera) at 1, ¶ 1.

59.     The summer, autumn, and winter of 2018 saw Delta Five undergo several other personnel changes: Ms. Ferlito resigned, as did Ms. DiPasquale; Mr. Paul Matubang and Mr. Robert Watts Winston ("Watts"), Mr. Winston's son, were hired as salespeople; Mr. La Barbera began and then ended his employment with Delta Five; and Mr. Michael Heeden was hired as President of Delta Five and became Plaintiff's new supervisor. Ex. A at 139:19–140:24.

60.     Plaintiff had a very good working relationship with Mr. Matubang, *id.* at 77:2–10, a "fine" and "professional" relationship with Mr. Heeden, *id.* at 85:22–86:3, and "a very professional relationship with Watts," *id.* at148:10–13.

61.     Indeed, with Watts, Plaintiff's relationship went further—she would often joke, engage in playful banter, and send smiling, blushing[7] emoji faces in her email exchanges with him. *Id.* at

---

[6] Plaintiff testified at her deposition that Mr. La Barbera was the Chief Marketing Officer, Ex. A at 84:1–11, but both parties now agree that the accurate title is Chief Revenue Officer.
[7] Plaintiff denies that the emojis were blushing, but Dep. Ex. 43 shows a smiling face with rosy, blushing cheeks. Ex. A at 136.

149:14–19, 150:5–19, 153:7–19; Dep. Ex. 43 at 136. She even told Mr. Winston "I love that kid of yours!" Ex. A at 150:5–15.

62.     Delta Five hired Mr. Matubang to assist with West Coast sales. *Id.* at 169:6–11.

63.     His hiring resulted in a reshuffling of sales territory, but the reshuffling, according to Plaintiff, "made sense" from a business standpoint, and she worked collaboratively with Mr. Matubang to make sales. *Id.* at 169:12–170:9.

64.     Delta Five hired Watts to assist with the sale of its bed bug devices. *Id.* at 147:20–148:1.

65.     Although Watts was Mr. Winston's son, Watts brought experience, support, and industry know-how to Delta Five because he had previously worked as the general manager of a Hampton Inn and had other relevant industry experience. *Id.* at 148:2–9; Ex. B at 37:4–40:19.

66.     As she did with all the other salespeople, Plaintiff worked closely and collaboratively with Watts to service accounts, attend and sell at conferences, and make sales calls together. Ex. A at 148:15–24.

67.     Plaintiff's collaboration with Watts specifically included the Company's Hilton accounts.[8] *Id.* at 148:10–149:13.

68.     Plaintiff alleges that Delta Five's hiring of Watts was retaliatory because Watts collaborated on, and assisted her with, Hilton accounts. *Id.* at 164:2–165:6. Specifically, Plaintiff felt Watts' comments that he would be visiting Hilton's McLean, Virginia corporate headquarters despite having had no contacts there, his taking on Hilton accounts she had been working with, his

---

[8] Plaintiff's denial of this fact does not create a genuine dispute of fact. Plaintiff answered affirmatively to the question of whether she and Watts collaborated as salespeople for the same company. Ex. A at 148:22–24. When asked specifically about Hilton, Plaintiff testified that she "oversaw the Hilton corporate level. Watts worked with Hilton management and companies that managed Hiltons." *Id.* at 149:4–7. Plaintiff's citation to her declaration does not change or dispute this testimony. Ex. 1 at 1, ¶ 3.

setting up Hilton criteria for pilot programs to the exclusion of Plaintiff, and his scheduling of sales calls despite Plaintiff's sales experience, were all evidence of retaliatory motive. ECF 68-6, Ex. 6 (P. Landon Dep.) at 164:25–167:22.

69.     Plaintiff also testified that it was retaliatory that Watts oversaw and scheduled some sales calls because he wasn't a manager and purportedly had less sales experience than her. Ex. A at 167:8–17.

70.     When asked if she suffered a change in her job duties or her "day-to-day" experience at Delta Five, Plaintiff testified that there was no meaningful change as a result of Delta Five hiring Watts. *Id.* at 168:2–14.

**Delta Five' Focus on Salesforce**

71.     Starting in the autumn of 2018, Plaintiff worked on revamping the Company's use of Salesforce software. *Id.* at 198:4–22. She was tasked with revamping Delta Five's Salesforce software, *id.* at 198:4–22, 216:1–3, and she claims to have spent eighty hours working on that task, Ex. 1 at 3, ¶¶ 9–10.

72.     Prior to this rebuild, Plaintiff stored contact information for clients and prospective clients (such as Hilton) in "various places," including on her phone, in her email, and in her laptop computer. *Id.* at 197:10–25.

73.     During the rebuild, some Salesforce capabilities were unusable, but Delta Five employees could still store contacts within the system and, after initially testifying that she could not store her contacts in Salesforce, Plaintiff clarified that "yes" she could have stored some account information in Salesforce during the rebuild, just as her contacts could have been stored in Salesforce before the rebuild.[9] *Id.* at 198:1–3, 199:2–20. Plaintiff testified that she was the only

---

[9] Plaintiff's denial of this fact as argumentative does not create a genuine dispute of fact.

person fluent in using Salesforce, and her coworkers probably could not find the contact information. *Id.* at 222:18–23.

74.     Plaintiff, who had 20 years of experience using Salesforce, recognized that it was a "great" and "important" tool. *Id.* at 201:1–4.

75.     Plaintiff stated: "Of course you do that" when asked whether people use Salesforce "[i]n the earlier days" to "find information about someone else's [sales] account." *Id.* at 201:11–14.

76.     She also understood that it was Delta's Five policy and rule that salespeople needed to use Salesforce. *Id.* at 199:23–25.

**Plaintiff's Job Performance During the Last Six Months of Her Employment**

77.     Plaintiff's sales dropped to zero in the last several months of her employment.[10] Ex. C at 5–6.

78.     Plaintiff testified that she was "frustrate[ed]" with the way deals were proceeding, was under significant "pressure," and was, just generally, "not a happy camper" at Delta Five. Ex. A at 176:4–177:12, Dep. Ex. 45 at 140.

79.     In fact, in mid-December 2018, she told Mr. La Barbera: "I have to get out" when confronted with the need to revise the terms of a pending deal. *Id.*

80.     Around this same time, Plaintiff also became concerned that she would be terminated, a fear reinforced by Mr. La Barbera. *Id.* at 157:4–13.

**Plaintiff Prepares for Her Separation from Delta Five**

81.     In the latter part of December 2018, Plaintiff reached out to her friend, Mr. Steve Hyatt, who was a career human resources officer. *Id.* at 177:15–178:14.

---

[10] Plaintiff's citations to the Declarations of Dr. Janet and Mr. La Barbera are inapposite since neither individual was at Delta Five during Plaintiff's last several months of employment; in other words, they do not have personal knowledge of Plaintiff's performance during that time.

82.     Plaintiff reached out to Mr. Hyatt because she believed she was going to be fired and wanted his guidance on "exactly what to do." *Id.* at 179:4–5.

83.     Mr. Hyatt told Plaintiff that she "needed to send [Delta Five HR] a note" and schedule a "sit down." *Id.* at 179:11–17.

84.     Plaintiff "had that email teed up before [she] went out on leave." *Id.* at 179:11–180:3.

85.     Mr. Hyatt instructed Plaintiff to make sure she told Delta Five that when she was terminated that she would consider her termination to be retaliatory. *Id.* at 177:15, Dep. Ex. 46 at 142.

86.     Mr. Hyatt recommended, and Plaintiff agreed, that she also had to make Delta Five terminate her—she should not resign. *Id.*

87.     At the same time, Plaintiff was also talking to legal counsel. *Id.* at 13:3–16, 179:12–13.

88.     She discussed the same things with her attorneys that she discussed with Mr. Hyatt, and her attorneys gave her the same advice—that is, she had to make Delta Five terminate her. *Id.* at 180:4–14.

89.     In mid-December, Plaintiff travelled to North Carolina for Delta Five's Christmas party. *Id.* at 185:2–12.

90.     While at Delta Five's office, Plaintiff took the opportunity to meet with Ms. Bell.[11] *Id.* at 185:22–24.

91.     Plaintiff wanted to ask if Mr. Wiehe would be at the party. *Id.* at 185:24–186:3.

92.     Plaintiff only talked with Ms. Bell long enough to confirm that Mr. Wiehe would not be present. *Id.* at 186:4–187:5. She told Ms. Bell that she was not comfortable being around Mr.

---

[11] Plaintiff's objection to the phrase "took the opportunity" is merely a semantic dispute and does not create a genuine dispute of material fact.

Wiehe, *id.* at 188:15–17, and Ms. Bell told her that he should not have been invited, *id*. at 186:19–187:5.

93.     Other than those comments, Plaintiff did not discuss anything else with Ms. Bell, including any alleged sex discrimination, harassment, or retaliation from any point during her employment. *Id.* at 186:4–187:5, 188:15–17; ECF 68-7, Ex. 7 (P. Bell Dep.) at 83:14–84:25.

94.     Ms. Bell, in turn, did not discuss this meeting with Mr. Winston, and therefore he had no knowledge of Plaintiff's meeting with Ms. Bell.[12] Ex. 7 at 84:14–25; Ex. B at 109:12–111:6.

**Plaintiff Takes Sick Leave**

95.     Plaintiff testified that since about November 2018 she had been suffering from coughs, chest pains, and insomnia. Ex. A at 223:6–16.

96.     Plaintiff discussed these symptoms with her husband, and coughs may have been observed by her coworkers, but she never affirmatively told anyone at work that she was having medical issues because she thought she simply "had a cold."[13] *Id.* at 223:17–224:13.

97.     On Wednesday, January 2, 2019, Plaintiff went to see her doctor because she "was sick" and "under severe stress at work." *Id.* at 234:14–235:7, 236:18–23, Dep. Ex. 54 at 161.

98.     The doctor told her to take the next two days (January 3 and 4, 2019) off work, which Plaintiff did. *Id.* at 234:14–235:4.

---

[12] Plaintiff's citations to Mr. Wiehe's and Mr. Winston's depositions do not create a genuine dispute of material fact, nor do they create an inference that Ms. Bell discussed the December 19, 2018 meeting with Mr. Winston.

[13] Despite Plaintiff initially testifying that she suffered from numerous other conditions during her employment, she later clarified in her deposition that her insomnia, nausea, abdominal pain, and emotional distress all manifested after she was terminated from Delta Five. Ex. A at pp. 244:22–250:19. She testified that her acid reflux was not diagnosed until after her termination, *id*. at 255:5–11, but she may have experienced symptoms prior to then, *id.* at 237:18–238:2.

99.     The doctor's note Plaintiff received simply said that she was under the doctor's care and could not return to work. Ex. A, Dep. Ex. 54 at 161.

100.    The doctor diagnosed Plaintiff with "acid [reflux]," but she does not remember, and cannot articulate, anything else about her condition, diagnosis, or prognosis, including how it was disabling, if at all. *Id.* at 236:6–237:1.

101.    In taking those two days off work, Plaintiff did not inform Ms. Bell that she needed to take any sort of medical leave, did not describe her symptoms, did not ask for any specific duration of leave, and did not raise the issue of, or ask for, any accommodation. *Id.* at 233:10–234:12.

102.    On Thursday, January 3, 2019, Mr. Heeden sent Plaintiff a text message asking if she was okay and offering help. *Id.* at 230:21–231:18, Dep. Ex. 53 at 159.

103.    Plaintiff thanked him for checking in and responded that although she thought she was having a heart attack, her symptoms were just stress related. Mr. Heeden said he was sorry to  hear that, told her to take care of herself, and instructed her to reach out if she needed anything. Ex. A, Dep. Ex. 53 at 159.

104.    Plaintiff did not ask for any assistance or accommodation from Mr. Heeden or from anyone else at Delta Five. *Id.* at 232:9–14.

**Plaintiff Sends Her Email**

105.    On January 4, 2019, while being out sick, Plaintiff was able to send an email to Ms. Bell that purported to recount the conversation that the two had a few weeks prior. *Id.* at 187:8–25, Dep. Ex. 47 at 144–45.

106.    This is the same email that Mr. Hyatt had advised Plaintiff to "tee[] up" before going out on leave and that she accordingly wrote in mid- to late-December. *Id.* at 179:12–180:3, 188:1–4.

107.    In this email, Plaintiff states that she met with Ms. Bell to discuss Mr. Wiehe's "inappropriate behavior." *Id.* at 188:7–10.

108.    Plaintiff testified at her deposition that she did not discuss *specifics* of Mr. Wiehe's inappropriate behavior. *Id.* at 188:14–21.

109.    Plaintiff provided additional clarifications at her deposition, including that she never complained to anyone about Mr. Wiehe being made the interim CEO.[14] *Id.* at 193:15–18.

110.    Mr. Winston testified that he was not aware of Plaintiff's email and that he did not have knowledge of her ever complaining about discrimination, harassment, or retaliation.[15] Ex. B at 110:1–112:3.

**Plaintiff Takes a Second Sick Leave**

111.    On Saturday, January 5, Plaintiff went back to her doctor for "stomach issues." Ex. A at 238:3–11.

112.    The doctor again diagnosed Plaintiff with acid reflux, but again, Plaintiff cannot remember, explain, or articulate anything about this diagnosis or how it was disabling, if at all. *Id.* at 237:2–238:19.

113.    Plaintiff's doctor drafted a note excusing Plaintiff from work the next week (*i.e.*, Monday, January 7 through Friday, January 11), stating again that Plaintiff was under the doctor's care and could not return to work. *Id.* at 235:10–16, Dep. Ex. 55 at 163.

114.    Plaintiff took that week off work. *Id.* at 238:12–19.

---

[14] Defendants purported material fact violates this Court's Practice Standards by providing multiple examples in a single paragraph instead of writing "a simple, declarative sentence." Practice Standards § III.F.

[15] Plaintiff's doubt of Mr. Winston's veracity does not create a genuine dispute of fact regarding whether he testified as such.

115.    As with the prior leave, at the time she sent the second note, Plaintiff did not explain to Ms. Bell or anyone else at the Company that she was suffering from medical issues or that she needed any sort of medical accommodation. *Id.* at 238:20–239:13.

116.    Ms. Bell sent Plaintiff paperwork for taking short term disability. *Id.* at 239:16–240:4, Dep. Ex. 56 at 165.

117.    Ms. Bell sent this form to Plaintiff to notify her that she was about to use up her paid sick leave allotment and to inform her that additional leave would need to be unpaid. *Id.*

118.    Plaintiff testified that she completed the form and provided all necessary documentation, *id.* at 239:16–241:12, but Plaintiff admits this is not correct; when presented with a letter from the short-term disability provider sent to her stating that she had not responded and provided all necessary information, Plaintiff acknowledged that she did not ensure all information was provided by her own doctors and did not follow up or pursue her short-term disability benefit, *id.* at 241:15–242:17, Dep. Ex. 57 at 175–76.

119.    Likewise, when Ms. Bell informed Plaintiff that she had used all her paid sick leave, Plaintiff did not respond—she did not ask for additional unpaid time off for her medical issues and she did not ask for an accommodation of any kind. *Id.* at 242:18–243:1.

**Plaintiff Refuses to Help Her Coworkers Help Her While She is Out Sick**

120.    On January 2, 2019, during Plaintiff's first sick leave, Mr. Brent West, Delta Five's Chief Financial Officer, emailed her to inquire into the status of the Hilton contract and specifically to ask Plaintiff to provide him with the "contact"[16] information of the individual she was working with at Hilton. *Id.* at 208:10–210:8, Dep. Ex. 49 at 147–48.

---

[16] It is undisputed that the email asks for "contract" information. The parties appear to disagree on whether this was a typographical error and should be read as "contact." In the context of the entire email exchange, it is likely that Mr. West meant to say "contact" information. He initially asked,

121.    Plaintiff did not reply to Mr. West. She reached out to her attorney seeking advice on whether she should respond. *Id.* at 210:18–23.

122.    On January 6, 2019, Plaintiff sent an email to Delta Five, this time to Mr. Heeden, reminding him that she was out sick and that she had cancelled all her work appointments. *Id.* at 210:24–211:24, Dep. Ex. 50 at 150.

123.    Mr. Heeden responded on the 7th, wished Plaintiff a speedy recovery, and again requested the contact information for her Hilton contact. *Id.* at Dep. Ex. 50.

124.    Mr. Heeden asked for the Hilton contact information so that the team could continue moving forward with the Hilton opportunity. *Id*.

125.    Later in the day, Plaintiff wrote to Mr. Heeden, stating that she was receiving work requests and telling him that she was not allowed to work. *Id.* at 213:8–214:1, Dep. Ex. 51 at 153–54.

126.    On the 9th, Mr. Heeden responded wherein he acknowledged and respected that Plaintiff was out sick and could not take on her normal work responsibilities. However, he again asked her to simply provide the name and phone number of her Hilton contact so that other Delta Five team members could pick up her work and ensure that the relationship with Hilton did not suffer during Plaintiff's absence. *Id.* at 214:11–19, Dep. Ex. 51 at 153.

127.    Plaintiff acknowledged that the Hilton contact information may not have been in Salesforce (as it should have been), that it probably was stored in her email and perhaps even her personal

---

"Who are we working with at Hilton?" Ex. A, Dec. Ex. 49 at 148. Plaintiff responded that it was "HSM—Contract team." *Id.* at 147. The email in question then requests that Plaintiff send Mr. West "their contract information." *Id.* This understanding comports with Mr. Heeden's later request for Plaintiff's "contact information." Ex. A, Dec. Ex. 50 at 150. Thus, even when viewed in the light most favorable to Plaintiff, the email only makes reasonable sense when construed as a request for "contact" information.

cell phone, and that she was the only person who was fluent in Salesforce, so others probably did not know where it was or where it could potentially be. *Id.* at 214:20–216:14, 219:21–222:23.

128.    Plaintiff replied to Mr. Heeden's January 9th email on January 14, her first day back from sick leave. *Id.* at 217:15, Dep. Ex. 52 at 156–57.

129.    Instead of providing the contact information, Plaintiff responded that the "Hilton contract can be sent back to me[,] and I will forward it to my contact copying the team, as Hilton is my responsibility[,] and it is part of my Business Development goals." Ex. A, Dep. Ex. 52 at 156.

130.    Mr. Heeden replied the next day, exchanged pleasantries, and again instructed Plaintiff to provide the contact information for the individual she was working with at Hilton. *Id.*

131.    After these multiple requests for the contact information, Plaintiff did provide the name and phone number for her contact at Hilton. *Id.*

**Mr. Winston Decides to Terminate Plaintiff's Employment**

132.    On January 16, 2019, Delta Five terminated Plaintiff's employment. Ex. A. at 230:16–19.

133.    Mr. Winston testified that he terminated Plaintiff because "salespeople need to sell, and she wasn't selling," "she was withholding contacts that were . . . corporate property," and "[s]he was communicating with contacts at Hilton using her own personal emails and not using . . .corporate standard Sales[f]orce to keep records so we had records." Ex. B at 78:22–79:22.

134. Mr. Winston, who made all important personnel decisions, decided on his own to terminate Plaintiff.[17] *Id.* at 42:3–19, 78:22–79:4, 97:5–22.

_____

[17] Plaintiff does not cite to specific evidence in the record to create a genuine dispute of material fact in violation of this Court's Practice Standards.

135.    After Plaintiff's termination, Delta Five only ever hired one other salesperson, a female employee named Arielle Magnanini. Ex. C at Decl. Ex. B (offer letter from May 2019 for a sales administrative assistant position) at 8–9, Decl. Ex. C (Delta Five employee spreadsheet) at 11.

<u>ANALYSIS</u>

As mentioned earlier, Plaintiff brings eight claims against Defendants: two for alleged violations of Title VII, three for alleged violations of the ADA, and three state law claims. At this time, Plaintiff has abandoned certain claims, including those under the ADA. The Court will address those claims first. Then, the Court will proceed to evaluate Plaintiff's Title VII discrimination and retaliation claims. Finally, the Court will consider Plaintiff's state law claims.

## I.    <u>Abandoned Claims</u>

Plaintiff confesses her ADA-related claims. ECF 75 at 2. Specifically, "[s]he now consents to the dismissal of her Third, Fourth, and Fifth Claims for Relief under the ADA relating to discrimination, reasonable accommodations, and retaliation." *Id.* at 52. Based on those representations, the Court will grant summary judgment for Defendants on those claims. Additionally, Plaintiff has abandoned any Title VII hostile work environment claim. *Id.* at 35 ("Mr. Wiehe's comments to Ms. Landon and others demonstrate that gender played a role in the decision to terminate her, even if those comments do not rise to the level necessary to prove a hostile work environment claim."), 50 ("Ms. Landon concedes that her treatment before she was terminated did not, in and of itself, rise to the level of an actionable hostile work environment."). Therefore, the Court will not consider such a theory when evaluating Plaintiff's Title VII claims.

## II.    <u>Title VII Discrimination</u>

An employer may not discriminate against an employee on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(2). Here, Plaintiff asserts Defendants discriminated

against her on the basis of sex. Both parties agree that the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) applies in this case. Accordingly, Plaintiff bears the burden of establishing a prima face case of sex discrimination. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). "[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). Defendants assert, and Plaintiff does not dispute, that a plaintiff in this context establishes a prima facie case by showing that (1) she is a member of a protected class; (2) she was qualified and satisfactorily performed her job; and (3) she was terminated under circumstances giving rise to an inference of discrimination. *Robinson v. Dean Foods Co.*, 654 F. Supp. 2d 1268, 1276 (D. Colo. 2009); *see also Smith v. Okla. ex rel. Tulsa Cnty. Dist. Attorney*, 245 F. App'x 807, 811 (10th Cir. 2007) (utilizing factors in sex discrimination case).

If the plaintiff establishes a prima facie case, the burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for the termination. *PVNF, L.L.C.*, 487 F.3d at 800. Should the employer do so, "the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *Id.* Generally, a plaintiff may demonstrate pretext by showing that "'the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision.'" *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013)). "This is often accomplished 'by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.'" *Id.* (quoting *Tabor*, 703 F.3d at 1216).

Here, Defendants argue that Plaintiff cannot establish a prima facie case because she cannot show that she was satisfactorily performing her job duties nor that her discharge occurred under circumstances giving rise to an inference of sex discrimination. Mot. at 24. If the Court finds Plaintiff has established a prima facie case, Defendants challenge whether Plaintiff can properly show pretext. *Id.* at 27. Because the Court agrees that Plaintiff has not met her burden of establishing a prima facie case, the Court does not reach the issue of pretext.

### A.      Prima Facie Case: Performance

Defendants contend that Plaintiff failed to satisfactorily perform her job because she failed to make any sales in the last five months of her employment. ECF 63 at 23–24. Plaintiff responds that she only needs to provide some evidence of good performance and asserts that she has done so because she held the job for over a year, provided testimony of her good job performance, and made fifteen sales while with the company. ECF 75 at 33. As an initial matter, two things Plaintiff points to cannot help her establish her satisfactory performance. First, Plaintiff posits that testimony from previous supervisors at Delta Five demonstrate her good job performance. *Id.* However, these supervisors were no longer employed with Delta Five at the time Plaintiff was terminated. Dr. Janet resigned from Delta Five in July 2018, Ex. 2 at ¶ 2, and Ms. Ferlito resigned in September 2018, Ex. A at 14:9–14, Ex. C, Decl. Ex. C at 11. Neither would have personal knowledge beyond their resignation dates of whether or not Plaintiff satisfactorily performed her job leading up to her termination.

Second, Plaintiff's time at Delta Five, namely one year, does not support her prima facie case. *See Rolland v. Primesource Staffing, LLC*, 257 F. App'x 68, 71–72 (10th Cir. 2007) (noting that an employee with less than a year with the company failed to produce evidence of satisfactory performance). Those cases in which the duration an employee is with a company evidences

satisfactory performance generally have employees who worked for multiple years. *MacDonald v. Eastern Wyo. Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991) (plaintiffs employed for four years); *Hakeem v. Denver Pub. Schools*, No. 20-cv-00083-PAB-KLM, 2020 WL 4289422, at *6 (D. Colo. July 7, 2020) (plaintiff employed for twenty-two years); *Valencia v. GEO Grp., Inc.*, No. 05-cv-00296-LTB-PAC, 2005 WL 3416118, at *3 (D. Colo. Dec. 13, 2005) (plaintiff employed for nearly five years). Working for a year with Delta Five does not suffice, alone, to demonstrate adequate performance.

Consideration of the remaining evidence leads to a close call of whether Plaintiff continued to satisfactorily perform her job at the time leading up to her termination. On the one hand, Plaintiff closed zero sales between August 7, 2018 and January 16, 2019. Ex. C, Decl. Ex. A at 5–6. It is strange to say that a salesperson who did not sell performed her job satisfactorily. To put it in a different context, a surgeon who performs zero surgeries for five months out of a year, even if that surgeon worked by having follow-up appointments and new consultations, would be hard-pressed to say that she satisfactorily performed her job as a surgeon.

On the other hand, Plaintiff's offer letter described the major initial objectives of her position as beyond simply making sales. They included helping "spearhead the Hospitality-emphasized channel sales efforts for the U.S." and growing "Delta Five's geographic and overall footprint of Hospitality sales through procurement and maintenance of strategic partnerships . . . ." Ex. A, Dep. Ex. 36 at 125. In her declaration, Plaintiff avers that she spent eighty hours working on rebuilding Salesforce in the fourth quarter of 2018. Ex. 1 at 3, ¶ 10. Although she did not close a sale during her last several months of employment, Plaintiff did receive credit for two sales after her termination. Ex. C, Decl. Ex. A at 5–6; Ex. 1 at 4, ¶ 14. Moreover, she was never disciplined or counseled while at Delta Five. *Id.* at 5, ¶ 20. Given the low bar required at this stage, the Court

25

finds that Plaintiff has provided "some evidence" of satisfactory job performance. *Paup v. Gear Prods., Inc.*, 327 F. App'x 100, 109 (10th Cir. 2009) (noting that a plaintiff "need only provide 'some evidence of good performance'").

Beyond that, Plaintiff's self-evaluation of her performance can be used to substantiate "some evidence" in this context. *E.g.*, *Hakeem*, 2020 WL 4289422, at *5 (using the plaintiff's estimation that he was "overqualified" for his position as a mark of "some evidence"). More importantly, there is no evidence in the record to establish any objective criteria by which to judge Plaintiff's performance. For examine, in *Lawson v. Heartland Payment Sys., LLC*, the court found that the plaintiff failed to establish satisfactory performance because the only evidence of such performance was her own testimony. No. 18-cv-03360-PAB-SKC, 2021 WL 1192934, at *6 (D. Colo. Mar. 29, 2021). The court reasoned that "plaintiff did not meet the objective criteria defendant had in place for someone in her position, and there is no countervailing evidence, such as post-hoc explanations . . . to support plaintiff's assertion that these job requirements were not legitimate." *Id.* In this case, there are no objective criteria (e.g., make two sales a month) by which to evaluate Plaintiff's performance. The evidence that does exists compels a finding that Plaintiff has provided "some evidence" of satisfactory performance.

### B.      Prima Facie Case: Inference of Discrimination

Defendants also argue that Plaintiff cannot establish that her termination gives rise to an inference of discrimination. ECF 63 at 24. Plaintiff rebuts this argument by emphasizing that she is able to raise an inference of discrimination "based on Mr. Wiehe's sexually harassing comments to her, Mr. Wiehe's negative comments about women to decisionmakers at Delta Five, and contradictions in Delta Five's explanations for her termination." ECF 75 at 35. As an initial matter, the latter reason, namely contradictions, conflates pretext with her prima facie burden. Looking at

contradictions in the reasons for termination necessarily implies the Court must examine those reasons and whether a reasonable jury could find them to be pretextual. But before the Court can get there, Plaintiff must first meet her prima facie burden. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) (noting courts "must not conflate the prima facie and pretext stages of the *McDonell Douglas* test"). Therefore, the Court will not examine "contradictions" at this time. However, the Court will consider as part of the prima facie case Plaintiff's theory that two male salespeople, Watts and Mr. Matubang, were hired to replace her.

Plaintiff's burden here is "not onerous" and only requires a "small amount of proof necessary to create" an inference of discrimination. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (citations omitted). However, "[t]he real question, it must be remembered, is whether [Plaintiff] has shown actions taken by [Delta Five] from which one can infer . . . that it is more likely than not that such actions were based on a discriminatory criterion illegal under [Title VII]." *Robinson v. Dean Foods Co.*, 654 F. Supp. 2d 1268, 1276–77 (D. Colo. 2009). With that in mind, the Court will address Mr. Wiehe's comments first, followed by hiring of Watts and Mr. Matubang.

1.      Mr. Wiehe's Comments[18]

The record establishes that Mr. Wiehe made several comments about Plaintiff's buttons on her jacket at the HITEC conference. Ex. A at 115:20–116:8. While admitting that the buttons were in fact large, *id.* at 116:9–117:4, Plaintiff posits that Mr. Wiehe emphasized the word "large" when

---

[18] The Court acknowledges, as Defendants argue, that in pointing to Mr. Wiehe's comments, Plaintiff is alleging a cat's paw theory of liability; that is, Defendants should be liable because Mr. Wiehe, as a subordinate, caused her termination. *See Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019). Yet, the cat's paw theory is used "to establish pretext." *Id.* As such, Mr. Wiehe's comments may not be relevant to Plaintiff's burden of establishing a prima facie case. However, because Plaintiff relies on the comments so heavily, the Court examines them here.

making the comments, Ex. 2 at 2, ¶ 5. Following those remarks, Mr. Wiehe also made comments

at dinner regarding lewd statements a past boss had made about his wife. Ex. A at 122:10–22.

These comments are undisputed by the record.

Plaintiff points to additional comments, however, that are not generally admissible. For

instance, she alleges that Mr. Wiehe, either at or before the HITEC conference, stated that a sales

employee "sells with her tits" and referred to another as a "booth bunny." ECF 75 at 20, ¶ 153. To

support that assertion, Plaintiff cites to Dr. Janet's declaration. *Id.* But the substance of that

declaration does not contain anything about such comments. It specifically mentions the buttons

and wife comments but lacks any discussion of "sells with her tits" or "booth bunny." Ex. 2 at 2–

4, ¶¶ 1–9. Exhibit A attached to Dr. Janet's declaration contains a list created by Ms. Fussell and

Ms. Ferlito[19] of alleged inappropriate comments made by Mr. Wiehe. Ex. 2 at 3, ¶ 6; Decl. Ex. A

at 5. The "sells with her tits" and "booth bunny" comments appear on that list. *Id.*

Plaintiff does not address why these specific statements would be admissible. Perhaps

anticipating hearsay problems, Plaintiff argues, generally, that statements in her Response fall

under F.R.E. 801(c)(2) (i.e., not offered for the truth of the matter asserted) and/or (d)(2) (i.e., not

hearsay because they are an opposing party's statements). ECF 75 at 4 n.2. Despite acknowledging

potential admissibility problems, Plaintiff does not provide an explanation for why such statements

would be admissible here. After all, "[o]nly admissible evidence may be considered when ruling

on a motion for summary judgment." *Jaramillo v. R& S Steel, Inc.*, No. 10-cv-00346-REB-BNB,

2011 WL 662778, at *1 (D. Colo. Jan. 20, 2011) (citing *World of Sleep, Inc. v. La-Z-Boy Chair*

---

[19] Plaintiff does not cite to other evidence to support her assertion. However, the Court notes that
Ms. Ferlito's declaration contains a statement that "staff" told her that "Mr. Wiehe commented
that during the HITEC conference, a member of [the] sales team 'sold with her tits.'" ECF 68-10
(M. Ferlito Decl.) at 3, ¶ 4.

*Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985)). Failing to meet this burden, the Court would not normally find the evidence to be admissible. However, Plaintiff is not using these statements for the truth of the matters asserted. As such, the statements are likely not hearsay. But, even considering the statements, as the Court will explain shortly, they do not materially alter the outcome of Plaintiff's prima facie case.

Plaintiff also points to other statements Mr. Wiehe allegedly made to Mr. La Barbera regarding concerns about Ms. DiPasquale and Ms. Ferlito and criticizing Plaintiff, including that he wanted to get rid of Plaintiff. ECF 75 at 25 (citing Ex. 10, ¶ 8). Again, Plaintiff does not indicate why such statements would be admissible, which is generally fatal to their admissibility. Regardless, Plaintiffs general citations to 801(c)(2) and (d)(2) do not support the statements' admissibility. Unlike the previous statements, Plaintiff is asserting these statements for their truth. Thus, they do not fall under F.R.E. 801(c)(2). For 801(d)(2), in the Tenth Circuit, "an employee's statements are not attributable to his employer as a party-opponent admission in an employment dispute unless the employee was 'involved in the decisionmaking process affecting the employment action' at issue." *Johnson*, 594 F.3d at 1208–09 (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005)). The record reveals no genuine dispute that Mr. Winston was the sole decisionmaker for terminating Plaintiff's employment. Ex. B at 42:3–19, 78:22–79:4, 97:5–22. Consequently, Mr. Wiehe's other comments cannot be an admission by a party opponent and thus admissible for consideration on summary judgment.

"An inference of discrimination arises where there is a 'logical connection' between each element of the prima facie case and the alleged discrimination." *Calderon v. Safehouse Progressive Alliance for Nonviolence*, No. 11-cv-02536-PAB-MEH, 2013 WL 2153278, at *7 (D. Colo. May 17, 2013) (citation omitted). With regard to comments by supervisors, a plaintiff does not need to

demonstrate that comments were made in the direct context of her termination but "must show a nexus between the allegedly discriminatory statements and the employer's decision." *Plotke*, 405 F.3d at 1107 (citations omitted). In *Plotke*, a historian (Dr. Plotke) alleged that her supervisor (Dr. Morris) and two other colleagues (Dr. Lackey and Mr. Mordica) made direct comments (e.g., calling her a "femi-Nazi") and indirect references (e.g., calling her by her first name instead of "Dr.") concerning her gender. *Id.* at 1106. The Tenth Circuit rejected the notion that such comments were "stray remarks" because they were directed to or about the plaintiff. *Id.* at 1107. The court concluded that a sufficient nexus existed between these comments and the plaintiff's termination because "Dr. Morris was Dr. Plotke's supervisor and ultimately decided to recommend that her employment not be extended beyond the probation period, relying heavily on the recommendations of Dr. Lackey and Mr. Mordica." *Id.*

The opposite conclusion is reached here. The record is devoid of evidence demonstrating Mr. Winston, the sole person with terminating authority over Plaintiff, relied on Mr. Wiehe's comments in the decision to terminate Plaintiff. Nor did Mr. Winston make similar comments about Plaintiff. While Mr. Wiehe's comments are not "stray comments" in the sense that at least some of them were directed to Plaintiff, there is simply no rational nexus between his comments and Delta Five's decision to terminate Plaintiff.

2.      Watts and Mr. Matubang

Plaintiff also points to the hiring of Watts and Mr. Matubang as evidence that her termination was the result of discrimination. ECF 75 at 36. Specifically, she contends that both individuals were assigned outsized roles "despite [Plaintiff's] superior experience and industry contracts," *id.*, and "were hired in anticipation of Delta Five terminating [Plaintiff]," *id.* at 37. But Plaintiff does not cite to the record for these propositions, so the Court is compelled to find such

statements to be merely speculative. There is hardly any evidence of Mr. Matubang's work history, experience, or performance to determine whether he was an inferior salesperson to Plaintiff. The minimal evidence in the record shows that he failed to make any sales commissions between the start of his employment in November 2018 and Plaintiff's termination in January 2019. That short time span is insufficient to compare to Plaintiff's performance, especially considering the holidays that occur during those months. As to Watts, Plaintiff admits that, although Watts was Mr. Winston's son, Watts brought experience, support, and industry know-how to Delta Five because he had previously worked as the general manager of a Hampton Inn and had other relevant industry experience. Ex. A at 148:2–9; Ex. B at 37:4–40:19. While Watts may have had less sales experience than Plaintiff, she also concedes that she suffered no changes in her job duties or her "day-to-day" experience at Delta Five as a result of Delta Five hiring Watts. Ex. A at 168:2–14. Plaintiff points to absolutely no evidence for the notion that Watts and Mr. Matubang were hired in anticipation of her termination. Based on all of this, the Court cannot find a "logical connection" between the hiring of the two male employees and Plaintiff's termination to create an inference of discrimination. Consequently, summary judgment in favor of Defendants is appropriate on this claim.

## II.    Title VII Retaliation

The *McDonnell Douglas* framework also applies to retaliation claims. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011). Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). A plaintiff establishes a prima facie retaliation claim when she shows that (1) she engaged in protected activity, (2) the employer took action that an objectively reasonable employee

would have found adverse, and (3) a causal connection exists between the protected activity and the adverse action. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999); *see also Hansen v. SkyWest Airlines*, 84 F.3d 914, 925 (10th Cir. 2016). Here, there are two instances in which Plaintiff allegedly engaged in protected activity: (1) the June 2018 "complaint" about Mr. Wiehe's comments during the HITEC conference; and (2) the December 2018 and January 2019 actions including speaking with Ms. Bell. As to the former, Defendants challenge whether Plaintiff can meet any element of her prima facie case. ECF 63 at 30. As to the latter, Defendants argue Plaintiff cannot establish the causal connection. *Id.* at 33.

### A.      June 2018 Complaint

For purposes of this Order, and acknowledging that Defendants contend otherwise, the Court will assume that Plaintiff engaged in protected activity. The question then becomes whether Plaintiff suffered a harm as the result of a retaliatory adverse action. In this context, an adverse action "'is not limited to discriminatory actions that affect the terms and conditions of employment.'" *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (quoting *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)). Instead, "'the scope of [Title VII's] anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm' and is thereby not limited to 'ultimate employment decisions.'" *Id.* (quoting *Burlington*, 548 U.S. at 67).

To determine whether an employer's action constitutes an adverse action for retaliation purposes, "the Tenth Circuit uses a liberal, 'case-by-case approach' that 'examin[es] the unique factors relevant to the situation at hand.'" *Chavez v. Adams Cnty. Sch. Dist. No. 50*, 176 F. Supp. 3d 1161, 1176 (D. Colo. 2016) (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)). "[T]he plaintiff must show that a reasonable employee would have found the action

materially adverse such that they might be dissuaded from making a charge of discrimination."
*Somoza*, 513 F.3d at 1213. "[W]hile the standard is sensitive to the particular circumstances of
each case, it prescribes an objective inquiry that does not turn on a plaintiff's personal feelings
about those circumstances." *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009)
(internal citation omitted). In other words, "[e]ach case is 'judged from the perspective of a
reasonable person in the plaintiff's position, considering all the circumstances.'" *Id.* (quoting
*Burlington*, 548 U.S. at 71). The Supreme Court has emphasized that courts should focus on
"*material* adversity because . . . it is important to separate significant from trivial harms."
*Burlington*, 548 U.S. at 68 (emphasis in original).

Based on the record in this case, the Court finds no genuine issue of fact that Plaintiff did
not suffer the requisite harm from her June 2018 complaint. Plaintiff does not specifically attempt
to rebut Defendants' argument that she did not suffer an adverse action from her June 2018
complaint. She does explain why it would be protected activity, ECF 75 at 45–47, but she then
focuses almost exclusively on why the December and January actions caused her termination, *id.*
at 47 ("Defendants accept that Ms. Landon's December and January actions constituted protected
activity. Motion, p. 33. However, they contend that that she cannot establish that the protected
activity caused her termination."). She makes mention of Mr. Winston temporarily appointing Mr.
Wiehe as the interim CEO over an all-female sales team. *Id.* at 50. However, she does not explain
why such an action would be materially adverse to the reasonable employee in plaintiff's position,
especially considering that she did not even complain about it at the time. Ex. A at 193:1–18. Put
differently, the Court finds that Plaintiff would not have been dissuaded from exercising her rights
under Title VII following the HITEC conference. *See Payan v. United Parcel Serv.*, 905 F.3d 1162,
1173 (10th Cir. 2018) (finding that placement on an employee improvement plan "would not cause

a reasonable employee to forego exercising his rights under Title VII"). Indeed, she was not dissuaded from speaking to Ms. Bell in December 2018 or sending her January 2019 email. *Somoza*, 513 F.3d at 1214 ("[T]he fact that an employee continues to be undeterred in his or her pursuit of a remedy, as here was the case, may shed light as to whether the actions are sufficiently material and adverse to be actionable."). For these reasons, there is no evidence that any action by Defendants, stemming from the June 2018 complaint, would have dissuaded Plaintiff from making a charge of discrimination. *Id.* at 1213.[20]

### B.     December 2018/January 2019 Actions

In addition to the June 2018 complaint, Plaintiff claims she engaged in protected activity on two other occasions: (1) speaking to Ms. Bell in December 2018; and (2) sending her email on January 4, 2019. Defendants concede the first two elements of the prima facie case for these actions but argue that she fails to establish the causal connection element. "To establish the requisite causal connection, Plaintiff must show that the decisionmakers took action against [her] out of a desire to retaliate for [her] formal discrimination complaints." *Singh*, 936 F.3d at 1043. "As a prerequisite to this showing, [Plaintiff] must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to [take adverse action against her] had knowledge of [her] protected activity." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008); *see also Petersen v. Utah Dept. of Corr.*, 301 F.3d 1182, 1188–89 (10th Cir. 2002).

---

[20] Although not explicitly stated in her Response, to the extent that Plaintiff argues that her termination is the adverse action resulting from her June 2018 complaint, Plaintiff likely failed to establish the requisite causation given the almost seven months that elapsed between her June 2018 complaint and her termination. *Hysten*, 296 F.3d at 1183–84 (finding three-month gap between protected activity and adverse action was too long to establish causation); *see also Hall v. Interstate Brands Corp.*, 395 F. App'x 519, 522 (10th Cir. 2010) (same).

As the Court already mentioned, the record clearly demonstrates that Mr. Winston was the sole figure who made the termination decision. Ex. B at 42:3–19, 78:22–79:4, 97:5–22. Thus, the question is whether Mr. Winston was aware of Plaintiff's protected activity. No evidence in the record establishes that he was.  Mr. Winston testified that he was not aware of Plaintiff's January 2019 email and that he did not have knowledge of her ever complaining about discrimination, harassment, or retaliation. Ex. B at 110:1–112:3. Plaintiff asks the Court not to believe such testimony. She cites to Mr. Wiehe's deposition in which he testifies he was not made aware of any concerns regarding his comments made at the HITEC conference until December 2018, Ex. 8 at 41:7–44:3, and Mr. Winston's testimony that he does not recall if he met with Ms. Bell in December 2018, Ex. B at 110:1–6. From that, she asserts that the Court can reasonably infer that Ms. Bell discussed with Mr. Winston her December 19, 2018 meeting with Plaintiff. While the Court must view the evidence in the light most favorable to Plaintiff, it need not make inferences in her favor that are unsupported by the record. For instance, Ms. Bell testified only that she took the various concerns from different employees about Mr. Wiehe's comments to Mr. Winston. Ex. 7 at 114:16–24. She does not testify that she specifically told him about Plaintiff's protected activity. The record leaves little doubt that Mr. Winston knew of the concerns against Mr. Wiehe, but it is devoid of any evidence that he knew about Plaintiff's protected activity. To the contrary, Mr. Winston testified that he had no knowledge.

It is not enough for Plaintiff to point to evidence of Mr. Wiehe's comments. *Singh*, 936 F.3d at 1043 ("But evidence of [supervisor's] alleged prior mistreatment of Plaintiff is not evidence that she was aware of Plaintiff's formal complaints."); *see also Gallagher v. Kleinwort Benson Gov't Sec., Inc.*, 698 F. Supp. 1401, 1405–07 (N.D. Ill. 1988) (finding plaintiff failed to establish prima facie case because complaint of unequal pay did not necessarily suggest gender

discrimination). For the prima facie case, she must demonstrate that Mr. Winston "knew she was engaging in protected opposition." *Petersen*, 301 F.3d at 1188. Plaintiff has not met this burden, so summary judgment is appropriate on this claim.

### III.   <u>State Law Claims</u>

Plaintiff also brings claims for unpaid commissions in violation of the Colorado Wage Claim Act (sixth claim for relief), breach of contract (seventh claim for relief), and unjust enrichment (eight claim for relief). ECF 33, Am. Compl. ¶¶ 103–18. Defendants argue they are entitled to summary judgment on all claims, providing separate analysis for each distinct claim. Plaintiff, though, addresses the claims jointly under a single heading. ECF 75 at 52–54. There, she argues that she is "owed at least seven days of accrued personal time off . . . a day's salary, and unpaid commissions of $1,568.42." *Id.* at 53. Plaintiff acknowledges that Delta Five issued her a check in that amount on February 21, 2019. *Id.* (citing Ex. C, Decl. Ex. A at 6). Regardless of any payment, she argues Defendants remain labile for statutory penalties pursuant to Colo. Rev. Stat. § 8-4-109(3)(b).

Before preceding to the merits of the claims, though, the Court first must consider whether it will exercise supplemental jurisdiction over Plaintiff's remaining state law claims in light of the granting of summary judgment on the federal claims. In the absence of diversity jurisdiction, "28 U.S.C. § 1367(c)(3) provides that a district court has the discretion to decline to exercise supplemental jurisdiction over a state law claim if 'the district court has dismissed all claims over which it has original jurisdiction.'" *VDARE Found. v. City of Colo. Springs*, 449 F. Supp. 3d 1032, 1051 (D. Colo. 2020); *see also Smith v. City of Enid ex. rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims.") (emphasis added).

"'[N]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'" *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 2011)), *abrogated on other grounds by Torres v. Madrid*, 141 S. Ct. 989 (2021); *see also Kinney v. Blue Dot Serv. of Kan.*, 505 F. App'x 812, 814–15 (10th Cir. 2012) (affirming district court's decision to not exercise supplemental jurisdiction over state law claims when federal claims, including Title VII claims, were dismissed).

Here, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims for three reasons. First, Defendants argue the Court should decline to exercise supplemental jurisdiction, ECF 77 at 50 n.11, and Plaintiff does not argue in favor of exercising jurisdiction. Second, "[t]he Court concludes that any potential delay or duplication resulting from a dismissal without prejudice does not constitute a compelling reason to retain jurisdiction." *U.S. v. Ledford*, No. 10-cv-01351-PAB-MEH, 2012 WL 1079552, at *3 (D. Colo. Mar. 30, 2012); *see also Hamilton v. Upper Crust, Inc.*, No. 10-CV-0718-CVE-PJC, 2011 WL 3880932, at *10 (N.D. Okla. Sep. 2, 2011) ("The Court finds that the Tenth Circuit's expressed preference for declining pendent jurisdiction outweighs the parties' slight interest in preventing delay."). Put differently, the general preference of declining to exercise supplemental jurisdiction even applies at the summary judgment stage. *See Adamson v. Multi Comm. Diversified Serv., Inc.*, 514 F.3d 1136, 1153 (10th Cir. 2008) (affirming "district court's decision to decline to exercise supplemental jurisdiction over state law wage and defamation claims" when it granted summary judgment on federal employment discrimination claims). Third, "the Court notes that 'Colorado law recognizes if a plaintiff asserts all of his or her claims, including state law claims, in federal court, and the federal court declines to exercise supplemental jurisdiction over the state claims, the plaintiff may refile those claims in state court.'" *Ledford*, 2012 WL 1079552, at * 3 (quoting *Brooks*, 614 F.3d at 1230); *see also* 28

U.S.C. § 1367(d) (providing that the state's applicable statute of limitations "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period").

## **CONCLUSION**

Accordingly, Defendants' Motion [filed October 11, 2021; ECF 63] is **granted** as to Plaintiff's Title VII  and ADA claims, and summary judgment is entered in favor of Defendants on those claims. The Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3) over Plaintiff's state law claims, and they are therefore dismissed without prejudice. The Clerk of the Court is directed to close this case.

Entered this 10th day of March, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge